UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
JUAREZ BARRETO,

                    Plaintiff,

                                <u>MEMORANDUM & ORDER</u>
      -against-                  10-CV-0028(JS)(AKT)

THE COUNTY OF SUFFOLK and
JOHN DOE #2,

                    Defendants.
------------------------------------X
APPEARANCES
For Plaintiff:      Patrick J. Reilly, Esq.
                  Brett H. Klein, Esq. PLLC
                  116 West 23rd Street, Suite 500
                  New York, NY 10011

For Defendants:     Brian C. Mitchell, Esq.
                  Suffolk County Department of Law
                  100 Veterans Memorial Highway
                  P.O. Box 6100
                  Hauppauge, NY 11788

SEYBERT, District Judge:

        Plaintiff Juarez Barreto ("Barreto" or "Plaintiff"), formerly a pretrial detainee at the Suffolk County Correctional Facility ("SCCF"), brought this action against the County of Suffolk (the "County") and John Doe #2 ("Doe 2" and, collectively, "Defendants"), claiming that Defendants violated his constitutional rights. Two motions are pending before the Court: (1) Defendants' motion for summary judgment (Docket Entry 115) and (2) Plaintiff's motion to substitute Corrections Officers for John Does (Docket Entry 111). For the following reasons, Defendants'

motion for summary judgment is GRANTED, and Plaintiff's motion to amend the caption is DISMISSED AS MOOT.

<u>BACKGROUND</u>

The Court assumes familiarity with the facts of this case, which are summarized in a prior opinion.  <u>See</u> <u>Barreto v. Cty. of Suffolk</u>, 762 F. Supp. 2d 482 (E.D.N.Y. 2010).  The salient details are discussed below.

I.   <u>The Assault</u>

On October 18, 2009, Plaintiff was assaulted by fellow inmate Maurice Wallace ("Wallace") and sustained serious injuries, including head trauma, a urinary tract infection, and bladder pain. (Defs.' 56.1 Stmt., Docket Entry 115-3, ¶ 1; Pl. Dep., Summ. J. Mot. Ex. F, Docket Entry 115-10, 99:9-13, 104:5-10, 117:4-20.)[1] Wallace is a member of the Bloods gang and had a record of three prior inmate altercations.   (Wynne Dep., Docket Entry 118-20, 51:10-19; Incident Report Forms, Docket Entry 118-19, at 3, 7, 11.)

The morning of the assault, Plaintiff took his breakfast to the day area[2] and sat a table, which was directly in front of

---

[1] The parties' 56.1 statements provide scant details on the underlying incident, so the Court relies on deposition transcripts and other portions of the record to set the context for this opinion.

[2] A day area may contain tables and bunks.  (Pierce Dep., Docket Entry 118-15, 35:15-25.)

his cell, with two other inmates.[3]  (Pl. Dep. 74:16-75:10, 77:15-78:2, 78:14-20.)  Wallace threw a milk container at Plaintiff and said, "When I get out I'm going to kick your fucking ass."  (Pl. Dep. 84:9-87:2.)  Plaintiff informed a corrections officer about the milk container but not Wallace's statement.  (Pl. Dep. 90:17-24; 108:11-17.)  The corrections officer allegedly said, "Well, it's some Spic, nigger, Jew boy shit.  Get the mop and clean up." (Pl. Dep. 90:17-24.)  Plaintiff complied, and approximately an hour later, Wallace reiterated that he was "going to kick [Plaintiff's] fucking ass."  (Pl. Dep. 91:15-92:16.)  Plaintiff returned to the table and began reading his Bible.  (Pl. Dep. 93:25-94:7.)  Wallace, coming from behind, struck Plaintiff's head.  (Pl. Dep. 94:18-95:19, 97:6-12.)  Plaintiff stood up, stumbled, and fell, smashing his face on a bed frame.  (Pl. Dep. 97:19-99:5.)  As a result, Plaintiff suffered cracked orbital and cheek bones, requiring facial reconstruction.  (Pl. Dep. 99:9-13, 104:5-10.)

## II.  Doe 2's Response

Ten days later, Plaintiff received surgery for his injuries at Stony Brook Hospital.  (Pl. Dep. 116:8-14.)  When he returned to the prison that evening, complications arose;

---

[3] Throughout the day, starting at 7 a.m., prisoners have the opportunity to leave their cells.  (Pierce Dep., Docket Entry 118-14, 21:15-22:15.)  The cells are then locked and reopened an hour later.  (Pierce Dep. 23:7-12.)

Plaintiff had trouble urinating and was catheterized twice at the SCCF Medical Unit, which was closed overnight at that time. (Pl. Dep. 117:4-20; Baker Dep., Docket Entry 118-16, 20:17-19, 21:5-10; DeStefano Dep., Docket Entry 118-18, 46:9-10.) Around 2:00 a.m., Doe 2 was making the rounds. (Pl. Dep. 119:2-13, 136:19-22.) Plaintiff requested to go to the Medical Unit, saying, "Please, I'm in a lot of pain." (Pl. Dep. 119:2-13.) Doe 2 said, "The Medical Unit is closed for now. I will talk--I will come back later." (Pl. Dep. 121:4-6.) An hour later, Plaintiff shouted out, "I got to go, I haven't been able to take a piss or anything like that." (Pl. Dep. 121:8-12.) Doe 2 responded, "The Medical Unit is closed. I'm not going to wake up the sergeant for some bullshit." (Pl. Dep. 121:14-16.) He also said that Plaintiff needed a "fucking attitude adjustment" and had to "[w]ait until 7:30 or 8:00 A.M." (Pl. Dep. 121:21-24.) Allegedly, Doe 2 never came back, and Plaintiff did not speak to anyone until 7:00 a.m. (Pl. Dep. 123:13-21, 124:22-25.)

At that time, a different prison guard arrived to count the inmates. (Pl. Dep. 127:23-25, 128:24-129:5.) Plaintiff told the guard that he was "in pain" and displayed his swollen stomach. (Pl. Dep. 123:22-25.) Shortly after, Plaintiff was taken to the Medical Unit. (Pl. Dep. 128:24-130:9.) A nurse then used a catheter, draining very dark urine and causing Plaintiff to go into septic shock. (Pl. Dep. 130:10-131:6.) Doe 2 later asked

Plaintiff how he felt; when Doe 2 received a response, he allegedly said, "Soft ass Spic, get the fuck out of America, asshole." (Pl. Dep. 137:5-18.) Corrections Officer Michael Baker, who Plaintiff asserts is Doe 2, does not recall any of the above events. (Baker Dep. 19:6-9, 21:18-22:16; see also Mot. to Amend, Docket Entry 111, ¶ 63.)

III. <u>The Grievance Process</u>

The SCCF provides the Inmate Grievance Program ("IGP") to remedy grievances, including inmate-on-inmate violence like Plaintiff's situation. (<u>See</u> Defs.' 56.1 Stmt. ¶ 6.) According to an affidavit submitted by Matthew Bogert, a Corrections Sergeant in the Suffolk County Sheriff's Department, "each inmate receives a copy of the Inmate Handbook," which outlines the rules of the IGP, upon entering the SCCF. (Bogert Aff., Summ. J. Mot. Ex. C, Docket Entry 115-7, ¶¶ 4-5.) Among its many rules, the IGP requires that prisoners file all grievances within five days of the underlying incident. (Defs.' 56.1 Stmt. ¶ 9; Inmate Handbook, Summ. J. Mot. Ex. B, Docket Entry 115-6, at 15-16.) Plaintiff signed a form acknowledging that he received the Inmate Handbook on March 6, 2009. (Booking Sheet Receipt, Summ. J. Mot. Ex. A, Docket Entry 115-5.) He was transferred to the custody of the New York State Correctional System on November 30, 2009. (Bogert Aff. ¶ 4.)

Between March 6, 2009 and November 30, 2009, Plaintiff did not file a grievance for the underlying incident. (Defs.' 56.1 Stmt. ¶¶ 10-11.) Plaintiff alleges that he never received the Inmate Handbook and was unaware of various options to pursue his grievances. (Pl. Dep. 158:24-159:2, 171:7-172:2.) However, Plaintiff's familiarity with the IGP is ambiguous, as illustrated by the following colloquies at his deposition:

> Q.   You were familiar, in October of 2009, that there was a grievance procedure in the Suffolk County Jail?
>
> A.   Yes, because I had gone down to the Law Library at some point and consulted with one of the officers there, and I filed several complaints.
>
> *   *   *
>
> Q.   -- do you mean after October 18th of 2009?
>
> A.   No.  In September, when I got my chest infection, that's when I found out. That's when I started filing grievances, because there were not taking care of me.
>
> Q.   If you know, were those grievances what are called medical grievances?
>
> A.   Yes.
>
> Q.   Are you familiar with the formal grievance process, for example, if you wanted to make a grievance saying that you lost or some of your property was damaged?
>
> A.   I did lose my property.  Filed a grievance.

*　　*　　*

> Q. . . . [W]ere you familiar that there's a
> grievance form that you can fill out to
> make complaints about things that happen
> in the jail that you might want to make
> a grievance about?
>
> A. Yes.

(Pl. Dep. 159:14-20, 159:24-160:14, 161:9-14.) Plaintiff asked for grievance forms at the law library but was always told to come back "tomorrow." (Pl. Dep. 173:4-12 (internal quotation marks omitted).) It is unclear which forms Plaintiff was referring to and whether Plaintiff was aware of multiple grievance procedures at the SCCF.

According to Plaintiff, he handwrote forty-two medical grievances, including one that mentions the underlying assault, but never received a response. (Pl. Dep. 172:6-23.) However, Bogert states that, based on prison records, Plaintiff never filed any grievances, formal or informal. (Bogert Aff. ¶¶ 9-11.)

IV. The Classification System

Also relevant to this case is the SCCF's classification system. According to Corrections Officer Glenn Pierce, inmates are not classified as violent or non-violent. (Pierce Dep. 44:14-45:5.) In other words, a non-violent offender may be housed with a violent offender. (DeStefano Dep., Docket Entry 118-17, 29:15-22.) For example, Wallace was charged with second-degree murder,

and Plaintiff was not charged with a violent crime. (Wynne Dep. 51:10-55:2, 56:5-58:5.)

Inmates may be placed in general housing, disciplinary housing, or administrative segregation if a prisoner feels he is in danger. (Pierce Dep. 26:15-25.) If, say, one inmate in his cell threatens an inmate in the day area, the SCCF may keep the cell inmate locked up and move the day area inmate to an empty cell. (Pierce Dep. 47:10-20.) But it bears noting that Plaintiff never informed anyone--at any point--that he feared Wallace. (Pl. Dep. 110:25-111:4.)

V.    <u>Procedural History</u>

On January 4, 2010, Plaintiff filed this lawsuit. (Compl., Docket Entry 1.) Since then, the Court has dismissed two iterations of the Complaint, and now, two claims remain. (<u>See</u> Docket Entries 8, 37.) <u>First</u>, Plaintiff argues that the County acted with deliberate indifference to a known constitutional violation by housing violent and non-violent inmates together (the "Municipal Liability Claim"). <u>Second</u>, Plaintiff contends that Doe 2 acted with deliberate indifference when he denied Plaintiff medical care following the underlying incident (the "Deliberate Indifference to Medical Needs Claim"). <u>See</u> <u>Barreto</u>, 762 F. Supp. 2d at 494.

Defendants first raise a procedural argument, alleging that the case must be dismissed for lack of subject matter

jurisdiction. (Defs.' Reply Br., Docket Entry 120, at 4–11.) To be sure, it is undisputed that Plaintiff failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"). (Defs.' 56.1 Stmt. ¶ 11; Pl. Dep. 165:5-11.) However, Plaintiff asserts that administrative remedies were not available to him and that special circumstances should excuse his failure to comply. (Pl.'s Br., Docket Entry 118-2, at 11-17.) To support these points, Plaintiff makes three arguments. First, he did not receive the Inmate Handbook that outlines the prison's grievance process. (Pl.'s Br. at 7, 11-12.) Second, the prison law library did not contain any grievance forms. (Pl.'s Br. at 9, 12.) Third, an injury prevented him from filing a timely grievance. (Pl.'s Br. at 7, 12.) In opposition, Defendants contend that these arguments are based on self-serving statements and are belied by Plaintiff's actions. (Defs.' Reply Br. at 4-11.)

As for Plaintiff's constitutional claims, Defendants reject the Municipal Liability Claim, arguing that Plaintiff cannot show that "the prior alleged altercations in which Wallace was involved were the result of the housing policy." (Defs.' Reply Br. at 11-12.) As for the Deliberate Indifference to Medical Needs Claim, Defendants do not explicitly address this point but essentially argue that Plaintiff cannot prove that Doe 2 "knew of, and disregarded, the existence of a substantial risk of serious harm." (Defs.' Br., Docket Entry 115-4, at 9.)

Although administrative remedies may not have been available to Plaintiff, his claims fail to raise a genuine issue of material fact. As discussed below, Defendants' motion is granted, and it follows that the Court need not address Plaintiff's motion to amend the caption. Plaintiff's motion to amend seeks to substitute John Does, not to add any new claims.[4] (See generally Mot. to Amend.)

DISCUSSION

I. Legal Standard

To prevail on summary judgment, the moving party must "show[] that there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). A dispute is genuine only if the evidence "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In reviewing the evidence, the Court must "assess the record in the light favorable to the non-movant and . . . draw all reasonable inferences in [his] favor." Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990).

If the moving party has satisfied this initial burden,

---

[4] The Court notes that Plaintiff seeks to substitute Corrections Officer Glenn Pierce for John Doe #1 and Corrections Officer Michael Baker for Doe 2. Substituting Doe 2 would have been the only permissible request because John Doe #1 was dismissed in the Court's prior opinion. Barreto, 762 F. Supp. 2d at 489.

the opposing party "'must come forward with specific facts showing that there is a <u>genuine issue for trial</u>.'" <u>Caldarola v. Calabrese</u>, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)). "Mere conclusory allegations or denials will not suffice." <u>Williams v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986).

II. <u>The PLRA and its Exhaustion Requirement</u>

To assert his claim in federal court, a would-be litigant must exhaust his administrative remedies. 42 U.S.C. § 1997e(a). The PLRA provides that a prisoner may not assert a claim "with respect to prison conditions . . . until such administrative remedies as are available are exhausted." <u>Id.</u> This requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." <u>Porter v. Nussle</u>, 534 U.S. 516, 532, 122 S. Ct. 983, 992, 152 L. Ed. 2d 12 (2002). Its purpose is "to reduce the quantity and improve the quality of prisoner suits," thereby "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." <u>Id.</u> at 524–25, 122 S. Ct. at 988.

Both parties agree that Plaintiff failed to exhaust his administrative remedies. (Defs.' 56.1 Stmt. ¶ 11; Pl. Dep. 165:5-

11.)  Accordingly, Defendants bear the initial burden of establishing that "a grievance process exists and applies to the underlying dispute" through "'legally sufficient sources' such as statutes, regulations, or grievance procedures." Hubbs v. Suffolk Cty. Sheriff's Dep't, 788 F.3d 54, 59 (2d Cir. 2015) (alteration omitted) (quoting Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir. 2003)).  If Defendants make such a showing, the burden shifts to Plaintiff to show that "other factors . . . rendered a nominally available procedure unavailable as a matter of fact."  Id. (citation omitted).

Recently, the Supreme Court's decision in Ross v. Blake, 136 S. Ct. 1850, 195 L. Ed. 2d 117 (2016), has supplanted the Second Circuit's analysis of this exhaustion requirement.  See Williams v. Corr. Officer Priatno, 829 F.3d 118, 121-22 (2d Cir. 2016) (citing Hemphill v. New York, 380 F.3d 680 (2d Cir. 2004)).  Now, the inquiry asks only if a prisoner exhausted administrative remedies that were "available."  Ross, 136 S. Ct. at 1862 (internal quotation marks omitted).  The Second Circuit previously endorsed exceptions based on "special circumstances" and estoppel arguments.  Hemphill, 380 F.3d at 686.  Thus, in the wake of Ross, the Court must dismiss Plaintiff's special circumstances argument out of hand.  See 136 S. Ct. at 1862 (holding that "[c]ourts may not engraft an unwritten 'special circumstances' onto the PLRA's exhaustion requirement").

The Supreme Court has provided three guideposts to determine whether "an administrative remedy, although officially on the books, is not capable of use to obtain relief." Williams, 829 F.3d at 123. For instance, administrative remedies are unavailable if: (1) an administrative remedy "operates as a simple dead end--with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) the grievance process is "so opaque that it becomes, practically speaking, incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) prison officials "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, 136 S. Ct. at 1859–60.

To begin, Plaintiff appears to rely on the third scenario. According to his deposition, Plaintiff sought grievance forms from the prison library but was always told to come back "tomorrow." (Pl. Dep. 173:4-12 (internal quotation marks omitted).) Construing the facts in the light most favorable to Plaintiff, "such interference with an inmate's pursuit of relief renders the administrative process unavailable." See Ross, 136 S. Ct. at 1860. But it is unclear whether Plaintiff is referring to the appropriate forms for the grievance process. This fact alone suggests a genuine issue of material fact that may warrant an administrative hearing.

In any event, Plaintiff also asserts that he does not understand the grievance process because Defendants never provided the Inmate Handbook.[5]  (Pl. Dep. 158:24-159:2, 171:7-172:2.) Defendants argue in opposition that Plaintiff's argument is self-serving and belied by the Booking Sheet Receipt, which shows that Plaintiff signed for the handbook.  (Defs.' Reply Br. at 9; Booking Sheet Receipt.)

The Second Circuit has intimated that this issue--whether a prisoner received an inmate handbook--might be "a contested issue of fact, despite a record that shows [a prisoner] receiv[ing] the handbook."  Ruggiero v. Cty. of Orange, 467 F.3d 170, 178 (2d Cir. 2006).  The Ruggiero court noted, in dicta, that a prisoner could meet the exhaustion requirement if "he was unaware of the grievance procedures contained within it or . . . he did not understand those procedures."  Id. at 178.

The Southern District's decision in Rivera v. New York City, No. 12-CV-0760, 2013 WL 6061759, at *6 (S.D.N.Y. Nov. 18, 2013), offers helpful insight.  There, the prisoner asserted that he never received an inmate handbook and did not understand the appeals process for grievances.  Id. at *5.  To bolster this assertion, the prisoner provided declarations from

---

[5] Although this argument does not fit squarely within Ross, those scenarios are "not . . . exhaustive" and merely guide the Court's inquiry.  Williams, 829 F.3d at 123.

nine inmates, eight of whom indicated that they signed for the handbook but never received it.  Id.  The prisoner explained that "[i]nmates are required to sign sundry documents upon admission to a [Department of Corrections] facility. . . .  The atmosphere here does not lend itself [to] conversations about what is going on. The environment is very hostile, to put it mildly."  Id. (internal quotation marks omitted; third alteration in original).

Based on the eight declarations and the prison's atmosphere, the court found that a genuine issue of material fact precluded summary judgment.  Id. at *6.  This result did not change even though the prisoner filed several first-level grievances in the past.  Id.  The court rejected this argument because the prisoner failed to comply with the appeals process, an avenue he never used before.  Id.

By most accounts, a prison's atmosphere can be intimidating at best and coercive at worst.  Admittedly, Plaintiff never explained why he signed the Booking Sheet Receipt even if he did not receive an Inmate Handbook.  But a rational juror may find that Plaintiff did feel coerced.  And even though Plaintiff failed to provide corroborating statements like the Rivera prisoner, Plaintiff states that he was unaware of the SCCF's grievance process, and the Court must assume all facts in the light most favorable to Plaintiff.  (See Pl. Dep. 158:24-159:2, 171:7-172:2.)

In fact, this Court reached the same conclusion in Dougherty v. County of Suffolk, No. 13-CV-6493, 2016 WL 3983623, at *4 (E.D.N.Y. July 25, 2016). That prisoner alleged that he never received an inmate handbook but did not offer corroborating declarations. Id. at *1. This Court, citing Rivera with approval, found a genuine issue of material fact because the parties submitted competing evidence and the prisoner never filed a grievance in the past. Id. at *3.

The Court is mindful that Plaintiff was aware of some grievance process. At his deposition he stated that he "filed several complaints" and "grievances." (Pl. Dep. 159:14-20, 159:24-160:14, 161:7-14.) In fact, Plaintiff alleges that he filed a medical grievance detailing the underlying incident. (Pl. Dep. 172:6-23.) Even assuming that this statement is true, that filing would not suffice because Plaintiff failed to follow the procedure outlined in the Inmate Handbook. See Macias v. Zenk, 495 F.3d 37, 44 (2d Cir. 2007) ("[A]lert[ing] the prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion." (internal quotation marks and citations omitted; alteration in original). Moreover, Bogert attested, under penalty of perjury, that Plaintiff never filed any grievances, formal or informal. (Bogert Aff. ¶¶ 9-11.) Thus, the Court finds that there is a genuine issue of material fact concerning exhaustion.

Defendants contest this conclusion, relying on Cruz v. DeMarco, No. 12-CV-4277, 2013 WL 4719086, at *6-7 (E.D.N.Y. Sept. 3, 2013). (Defs.' Reply Br. at 6-7.) In that case, a prisoner argued that administrative remedies were unavailable for two reasons: first, the prison did not accept medical grievances, and second, any grievances the prisoner did file "just disappeared." Cruz, 2013 WL 4719086, at *2 (internal quotation marks and citation omitted). The Court described these arguments as "completely self-serving and . . . devoid of any specific supporting details." Id. at *6. Thus, the Court granted summary judgment in favor of the prison. Id. at *8.

Although superficially similar, the difference in Cruz is that the prisoner was aware of the grievance process. Id. at *2. Barreto alleges that he was unaware. (Pl. Dep. 158:24-159:2, 171:7-172:2.) In light of Ruggerio, this distinction is decisive. Ruggiero, 467 F.3d at 178. In fact, the Cruz Court rested its conclusion on a well-worn principle of summary judgment: "Mere conclusory allegations or denials will not suffice." See Williams, 781 F.2d at 323. Specifically, the Court found that the prisoner's first argument was contradicted by the prison's grievance process and that his second argument was only supported by "two conclusory sentences in his filing." Cruz, 2013 WL 4719086, at *7. Accordingly, Defendants' reliance on Cruz is misplaced.

In sum, Defendants' argument is that Plaintiff bases his claim on self-serving statements. (Defs.' Reply Br. at 6-10.) But "[t]o hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the court--at an inappropriate stage--into an adjudication of the merits." <u>Danzer v. Norden Sys., Inc.</u>, 151 F.3d 50, 57 (2d Cir. 1998). Accordingly, because Plaintiff has shown a genuine issue on the exhaustion requirement, this issue must be left for the factfinder.[6] The Court will not grant an administrative hearing, however, because Plaintiff has failed to show a genuine issue of fact on his two substantive claims.

## III.  <u>The Deliberate Indifference to Medical Needs Claim</u>

First, Plaintiff argues that Doe 2 acted with deliberate indifference in contravention of the Eighth Amendment when he failed to attend to Plaintiff's medical needs. (Pl.'s Br. at 17–21.) The Court disagrees.

As an initial matter, the Eighth Amendment prohibits "cruel and unusual" punishment to a sentenced prisoner. <u>See</u> <u>Bell</u>

---

[6] It follows that the Court need not address Plaintiff's remaining argument that his alleged injuries excuse his failure to file grievance forms. <u>Cf.</u> <u>Tomony v. Cty. of Suffolk</u>, No. 10-CV-5726, 2013 WL 55821, at *6 (E.D.N.Y. Jan. 3, 2013) ("[A]ny delay in filing due to plaintiff's inability to obtain an official form may have been excused at the discretion of prison officials, had plaintiff attempted to file a grievance at all.") (citing N.Y. COMP. CODES R. & REGS., Tit. 7, § 701.6(g)).

v. Wolfish, 441 U.S. 520, 535 n.16, 99 S. Ct. 1861, 1872, 60 L.

Ed. 2d 447 (1979) (internal quotation marks omitted). However,

Plaintiff was a pretrial detainee during his time at the SCCF.

Nevertheless, this Circuit has extended the Due Process Clause of

the Fourteenth Amendment to pretrial detainees, and "the standard

for deliberate indifference is the same." Caiozzo v. Koreman, 581

F.3d 63, 70 (2d Cir. 2009); see also Cuoco v. Moritsugu, 222

F.3d 99, 106 (2d Cir. 2000) ("We have often applied the Eighth

Amendment deliberate indifference test to pre-trial detainees

bringing actions under the Due Process Clause of the Fourteenth

Amendment.").

As the Supreme Court explained in Estelle v. Gamble, 429

U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976), prison

officials violate the Eighth Amendment when they act with

"deliberate indifference to serious medical needs of prisoners."

"This is true whether the indifference is manifested by prison

doctors . . . or by prison guards in intentionally denying or

delaying access to medical care or intentionally interfering with

the treatment once prescribed." Id. at 104-05, 97 S. Ct. at 291

(footnotes omitted).

To determine whether a prison official was deliberately

indifferent to an inmate's medical needs, the Court engages in a

two-step inquiry. Chance v. Armstrong, 143 F.3d 698, 702 (2d

Cir. 1998). First, under an objective component, Plaintiff must

show that his medical condition was "sufficiently serious" or, in other words, "a condition of urgency, one that may produce death, degeneration, or extreme pain."  See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks omitted). Second, under a subjective component, he must show that Doe 2 "'kn[ew] of and disregard[ed] an excessive risk to [Plaintiff's] health and safety.'"  See Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994)).

Assuming a "sufficiently serious" medical condition, the Court's focus, then, is on the subjective prong.  Plaintiff must show that Doe 2 was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and th[at] Doe 2 "dr[e]w that inference."  Farmer, 511 U.S. at 837, 114 S. Ct. at 1979.  In that regard, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id. at 842, 114 S. Ct. at 1981.

In Hutchinson v. New York State Correction Officers, No. 02-CV-2407, 2003 WL 22056997, at *6 (S.D.N.Y. Sept. 4, 2003), for example, the prisoner suffered from chest pains, dizziness, and digestive problems--close analogues to Plaintiff's imperceptible bladder issues.  The court concluded that the prison officials did not act with deliberate indifference because the prisoner did not allege that the relevant prison personnel were ever aware of his

conditions.  Id.  So too here.  Plaintiff never advised Doe 2 about his ongoing medical issues, including his inability to urinate and the resulting bladder pain.  (See Pl. Dep. 117:4-20.)  At most, Plaintiff said to him, "I got to go, I haven't been able to take a piss or anything like that."  (Pl. Dep. 121:8-12, 122:10-12.) Doe appeared to find Plaintiff's complaints to be inconsequential. (Pl. Dep. 121:14-16 ("The Medical Unit is closed.  I'm not going to wake up the sergeant for some bullshit.").)  By contrast, Plaintiff showed his swollen stomach to the guard on patrol at 7:00 a.m.  (Pl. Dep. 123:22-25.)

The Court acknowledges that Doe 2 used incendiary language in response to Plaintiff's plight.  (Pl. Dep. 121:21-24 (stating that Plaintiff needed a "fucking attitude adjustment") & Pl. Dep. 137:5-18 ("Soft ass Spic, get the fuck out of America, asshole.").)  Moreover, Plaintiff waited approximately five hours to receive medical care.  (Pl. Dep. 119:2-13, 136:19-22, 127:23-25, 128:24-129:5.)  Similar delays have amounted to deliberate indifference.  Cf. Bass v. Jackson, 790 F.2d 260, 262-63 (2d Cir. 1986) (concluding that a five to six hour-delay for treatment amounted to deliberate indifference).  But based on the evidence, Doe 2 did not "'know[] of and disregard[] an excessive risk to [Plaintiff's] health and safety.'"  See Chance, 143 F.3d at 702 (quoting Farmer, 511 U.S. at 837, 114 S. Ct. at 1979).  Instead, his actions sound more in negligence than a constitutional

violation.  See Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977) (observing that "a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence").  Thus, Plaintiff failed to show a triable issue of fact that Doe 2 acted with deliberate indifference.

IV.  The Municipal Liability Claim

Finally, Plaintiff contends that the County violated his constitutional rights by housing him, a non-violent offender, in general population with violent offenders, such as Wallace. (Pl.'s Br. at 19.)  This argument is meritless.

On its face the County's housing policy does not violate the Constitution.  See, e.g., Barreto, 762 F. Supp. 2d at 491; Yergeau v. Vt. Dep't of Corr., No. 09-CV-0141, 2010 WL 1472899, at *1 (D. Vt. Mar. 8, 2010) ("Specifically, [the prisoner] has not cited any provision of federal law that prohibits housing violent and non-violent offenders in the same prison unit."); Kunkle v. Cox, No. 08-CV-0100, 2010 WL 5391600, at *11 (N.D. Ind. Dec. 22, 2010) ("[T]here is no constitutional requirement that inmates be classified by security level.").  In fact, courts have often refrained from second-guessing the decisions of prison administration.  Bell, 441 U.S. at 562, 99 S. Ct. 1886.  ("The inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution.").

However, in an as-applied challenge, Plaintiff may prove municipal liability under Section 1983 by showing a "'direct causal link'" between his housing arrangement and his injuries. Barreto, 762 F. Supp. 2d at 491 (quoting Burrell v. Hampshire Cty., 307 F.3d 1, 10 (1st Cir. 2002)). To do so, Plaintiff must establish deliberate indifference--or in other words, "that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." Jones v. Town of East Haven, 691 F.3d 72, 81 (2d Cir. 2012).

Deliberate indifference, as the term implies, requires more than negligence. Rather, a plaintiff must show that "'a municipal actor disregarded a known or obvious consequence of his action.'" Id. (quoting Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391, 137 L. Ed. 2d 626 (1997)). No such showing has been made here. Plaintiff never voiced any concerns that he feared an attack, even on October 18, 2009. (Pl. Dep. 110:25-111:4.) At most, he informed a corrections officer that Wallace threw a milk container but not that Wallace made a threatening statement. (Pl. Dep. 90:17-24, 108:11-17.)

In essence, Plaintiff asserts that Wallace had a propensity for attacking other inmates. To be sure, Wallace is a member of the Bloods gang and was the subject of three other inmate

23

altercations. (Wynne Dep. 51:10-19; Incident Report Forms at 3, 7, 11.) But Wallace's track record does not automatically indicate a constitutional violation on the part of the County, especially because inmates always face a risk of violence. Indeed, as this Court previously noted, "the mere existence of the chance that a prisoner might be injured by another prisoner" does not violate an individual's constitutional rights. See Barreto, 762 F. Supp. 2d at 488. Other Circuits have reached the same conclusion. See, e.g., Bistrian v. Levi, 696 F.3d 352, 371 (3d Cir. 2012) (rejecting an argument that "the risk that an inmate with a history of violence might attack another inmate for an unknown reason" because it was a "speculative risk"); Shields v. Dart, 664 F.3d 178, 181 (7th Cir. 2011) (per curiam) (affirming the district court's grant of summary judgment because "a general risk of violence in a maximum security unit does not by itself establish knowledge of a substantial risk of harm"). Plaintiff has failed to adduce evidence, such as statistical data, that the County's housing policy contributes to increased violence. Instead, this case is an isolated attack where no prison official was aware of any threats to Plaintiff. Thus, Plaintiff has failed to prove a genuine issue of fact that the County's housing policy reflected deliberate indifference.

<u>CONCLUSION</u>

Defendant's motion for summary judgment (Docket Entry 115) is GRANTED, and Plaintiff's motion to amend the caption (Docket Entry 111) is DISMISSED AS MOOT.  The Clerk of the Court is respectfully directed to CLOSE the case.


SO ORDERED.


/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    September __30__, 2016
          Central Islip, New York